UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

Jane Doe 11,

    Plaintiff,

Case No. 1:24-cv-4208

**DEMAND FOR JURY TRIAL**

Henry Jarecki,

    Defendant.

_____/

### **COMPLAINT**

Plaintiff, JANE DOE 11[1], by her attorneys Edwards Henderson PLLC and Boies Schiller Flexner LLP, for her Complaint against Defendant Henry Jarecki, avers upon personal knowledge as to her own acts and status and upon information and belief to all other matters as follows:

### **NATURE OF THE ACTION**

Plaintiff files this civil complaint for damages and other relief under (among other provisions of the law) the United States federal anti-sex trafficking statute, 18 U.S.C. §§ 1591-95, et seq.—the Trafficking Victims Protection Act ("TVPA")—and for sexual battery, assault, and intentional infliction of emotional distress related to sexual offenses as defined in article one hundred thirty of the penal law, pursuant to New York Adult Survivors Act, N.Y. CPLR § 214-j.

The suit arises from Defendant's, HENRY JARECKI's (hereinafter "JARECKI"), involvement in Jeffrey Epstein's sex-trafficking venture, and specifically, his willful and intentional violations of the United States federal anti-sex trafficking statute, 18 U.S.C. §§ 1591-95, et seq.—the Trafficking Victims Protection Act ("TVPA"). JARECKI knowingly participated

---

[1] Plaintiff is using the pseudonym "Jane Doe 11" in this Complaint in place of her real name. Plaintiff intends to file a motion to proceed under a pseudonym to protect her privacy because her allegations concern sexual abuse, and the disclosure of her name in conjunction with the allegations would cause her further harm.

1

in Jeffrey Epstein's sex trafficking organization and in the rape, sexual assault, coercive sex trafficking, and commercial sex of Jane Doe 11. JARECKI knew that Epstein would use means of force, threats of force, fraud, abuse of legal process, exploitation of power disparity, and a variety of other forms of coercion to cause young women and girls, including Jane Doe 11, to engage in commercial sex acts. Not only was JARECKI an enabler in Jeffrey Epstein's larger sex trafficking operation, but once he gained access to Jeffrey Epstein's victims, he directly participated in the sexual abuse and trafficking of young women who he knew were victims of Jeffrey Epstein's sexual abuse.

Before sexually abusing Jeffrey Epstein's victims himself, JARECKI, a licensed psychiatrist, was the go-to doctor to whom Epstein would send young females who were suffering from depression because of the sexual abuse inflicted on them by Epstein. JARECKI was utilized by Epstein to "treat" Epstein's victims, which included using his medical license to prescribe medication to Epstein's victims and to engage in improper and illegal behavior designed to assist Epstein in his abuse and to prevent disclosure to law enforcement or others by his victims. While acting as the doctor to the victim, JARECKI often provided medical and other information about Epstein's victims to Epstein which allowed Epstein to retain control over these fragile young women.

While JARECKI initially served the role described above in Epstein's sex-trafficking venture, JARECKI himself also directly engaged in the sex trafficking of Doe and other females he met through his friend, Jeffrey Epstein, where JARECKI used force, fraud, or coercion to cause these females, including Jane Doe 11, to engage in commercial sex with him. During his abuse of Doe, JARECKI engaged in repeated acts of sexual violence against Jane Doe 11.

## JURISDICTION, VENUE, AND TIMELINESS

1. This action is brought pursuant to various federal and state statutes, including the federal TVPA, 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Jane Doe 11 proceeds under the federal TVPA statute.

2. This Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

3. This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because JARECKI and Epstein conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in an illegal sex trafficking venture that originated in this District. In addition, JARECKI sexually abused and trafficked Jane Doe 11 in this District.

4. A substantial number of the acts, events, and omissions giving rise to this cause of action occurred in this District.

5. Plaintiff and Defendant entered into a Tolling Agreement prior to the filing of this action. Pursuant to the terms of that Agreement, the parties agree that this action has been timely filed pursuant to New York's Adult Survivor's Act, N.Y. CPLR § 214-j. Pursuant to the same agreement, this action has also been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that plaintiff shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value, from participating

in a venture which that person knew or should have known violated the laws against sex trafficking.

## PARTIES

6. Jane Doe 11 is a U.S. citizen who at all relevant times, was domiciled in the State of New York.

7. Jane Doe 11 is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

8. Jane Doe 11 is at serious risk of retaliatory harm, as JARECKI possesses tremendous wealth and power and has demonstrated a clear ability to cause her serious harm.

9. Jane Doe 11's safety, right to privacy, and security outweigh the public interest in her identification.

10. Jane Doe 11's legitimate concerns outweigh any prejudice to Defendant by allowing her to proceed anonymously.

11. Defendant, HENRY JARECKI, is an adult male born April 15, 1933, who at all relevant times was a resident and domiciled in the State of New York.

## FACTUAL ALLEGATIONS

### A. An Overview of Henry Jarecki's Role in the Epstein Sex Trafficking Venture

12. HENRY JARECKI is a wealthy, well-connected psychiatrist, academic, entrepreneur, producer, and philanthropist who had close ties to Jeffrey Epstein.

13. JARECKI was close personal friends with Jeffrey Epstein for many years, a friendship that developed out of a similar interest in the exploitation and sexual abuse of young women.

14. JARECKI served an integral role in Epstein's sex-trafficking scheme for years, as it was essential that when victims of Jeffrey Epstein were suffering emotionally due to the sexual abuse he was inflicting, Epstein have a psychiatrist he could trust to "treat" his victims in a way that was suitable for Epstein.

15. In addition to being a trusted friend, confidant, and psychiatrist that assisted in Epstein's continued sexual abuse and trafficking organization, as well as the concealment thereof, JARECKI visited Epstein at his New York home on many occasions and traveled with him as a passenger on Epstein's private plane, getting to know and enjoy Epstein's lifestyle and sex-trafficking operation.

16. JARECKI, a licensed psychiatrist, provided medical treatment to Epstein's victims at Epstein's behest. After the medical visits, JARECKI often shared the victim's confidential medical information with Epstein, a clear indication he was serving the interest of Epstein and not the victim/patient.

17. Epstein sent victims to JARECKI for psychological treatment when in vulnerable emotional conditions, as Epstein could not risk one of his sex-trafficked victims reporting depression as a result of sexual abuse to a doctor who was not friends with Epstein and who might in turn report the abuse to authorities.

18. JARECKI had been close friends with Jeffrey Epstein for years and knew that Epstein was using force, fraud, or coercion to cause victims, including those sent to JARECKI for "treatment," to engage in coerced commercial sex.

19.     JARECKI frequently communicated with Epstein on a regular basis using his email, hj@falconfone.com. JARECKI's communications were not only limited to Epstein, but to his staff, including Lesley Groff[2], and with victims, including Jane Doe 11.

20.     Within JARECKI's emails, lies extensive evidence of the role he played in Jeffrey Epstein's sex-trafficking operation as a psychiatrist who would use his license to "treat" Epstein's victims. They also provide further evidence that JARECKI was a perpetrator of sexual abuse of young women, both connected and not connected with Epstein.

21.     JARECKI knew and understood his various roles in the continued facilitation of Epstein's sex trafficking operation, in that he understood that if Epstein sent him a young female to treat for any psychiatric related issue, JARECKI was to serve Epstein's purposes above the clients to avoid unwanted attention on Epstein's sexual abuse of these young women.  JARECKI also understood that the females Epstein was sending were under Epstein's control and JARECKI could himself attempt to sexually abuse them without risk of being reported.

22.     JARECKI was also a prolific sexual abuser of young women and used his friendship with Epstein to obtain young females, usually initially as patients, to abuse, knowing that these individuals were under the complete control of Epstein, and had other extraordinary vulnerabilities related to employment or immigration status, and thus would not report the abuse out of fear.

23.     In addition to using his medical license to "treat" Epstein's victims in the manner that best suited Epstein's interests as opposed to the patient's, JARECKI also used force, fraud, and coercion to make certain that the victims Epstein sent him, including Jane Doe 11, engage in commercial sex with him, as delineated below.

---

[2] Lesley Groff was listed as a potential co-conspirator in Jeffrey Epstein's 2008 Non-Prosecution Agreement.

### B. Jarecki's Sex-Trafficking of Jane Doe 11

24.     In or around 2010, Jane Doe 11 came to the United States through a well-known modeling agency based in New York City and was in the process of obtaining a work visa.

25.     Jane Doe 11 struggled to find work because she could not legally model until she received her visa; a common issue for foreign models traveling to the United States.

26.     Jane Doe 11 was told by another model about Epstein, his many connections to the model and fashion industries, his philanthropic endeavors, and his desire to help young women, like Jane Doe 11, advance their careers.

27.     Jane Doe 11 was told that Epstein knew everyone in the modeling industry and would help her modeling career and solve her immigration problems.

28.     Within days, Jane Doe 11 met with Epstein at his mansion in the Upper East Side, where he promised to help her with her modeling career, acting, and even pay for her college, so long as she listened to him and followed his express instructions.

29.     Almost immediately, Epstein began sexually abusing Jane Doe 11 and then controlling her life.

30.     After suffering emotional distress as a result of the sexual abuse Jeffrey Epstein was inflicting on her, Jeffrey Epstein arranged for Jane Doe 11 to meet with DR. HENRY JARECKI at his home for treatment, as Epstein told Jane Doe 11 that JARECKI was the best doctor in New York City.

31.     Jane Doe 11 arrived for her doctor's appointment with JARECKI, an approximately eighty-year-old doctor, and she outlined her symptoms to JARECKI so he could diagnose and medically treat her depression.

32. JARECKI made Jane Doe 11 tell him about her life, including any negative thing that ever happened to her, and he eventually made her write it all out and kept the hard copy. Later, JARECKI would use her past against her to control her.

33. During this first consultation, JARECKI told Jane Doe 11 that he had something that could make her happy right away. However, instead of prescribing her medication, JARECKI presented her with an expensive wristwatch.

34. JARECKI then insisted that he give Jane Doe 11 a tour of his home. Despite her initial refusal, Jane Doe 11 followed JARECKI. Things took a horrible turn when JARECKI was showing Jane Doe 11 his room, as JARECKI pushed her hard onto a bed and forcibly raped her against her will.

35. When Jane Doe 11 returned to her apartment, sobbing uncontrollably, she showered and scrubbed her body as hard as she could.

36. Jane Doe 11 found herself in an impossible situation. Jeffrey Epstein had absolute power and control over her life and freedom in this country, and now he sent her to his older doctor friend for medical treatment who then raped her.

37. When Jane Doe 11 told Epstein what JARECKI had done, Epstein told Jane Doe 11 that he had made a deal with JARECKI and that Jane Doe 11 had to continue to see JARECKI; Jane Doe 11 believed she had no realistic or safe way to disobey Epstein, as he was too powerful and could/would destroy her life.

38. The next time Jane Doe 11 saw JARECKI, he told her that he knew what Epstein was doing to her and other girls and that he would save her from Epstein.

39. JARECKI told Jane Doe 11 that she was to have a "commercial relationship" with him and that she was no longer to see Epstein. This caused Jane Doe 11 extreme distress, as Jane

Doe 11 was disgusted by this idea and wanted instead to continue her modeling career, date someone her age, and be free from these older, powerful predators; however, she felt she would put her life and certainly her immigration status in serious risk if she were to disobey Epstein and JARECKI.

40. Without feeling she had a choice, Jane Doe 11 then transitioned from being sexually trafficked by Epstein to sexually abused and trafficked by JARECKI. Both of her traffickers had enormous power compared to her and given her immigration status, she was powerless against their demands.

41. JARECKI began giving Jane Doe 11 gifts and telling her that he would keep her safe so long as she listened to him.

42. JARECKI coerced Jane Doe 11 into following his every demand and she reasonably believed that if she did not, she would suffer serious injury.

43. JARECKI told her that so long as she behaved for the duration of JARECKI's trafficking, he would buy her an apartment.

44. JARECKI learned everything he could about Jane Doe 11, including her financial and immigration situation, and he used that knowledge to manipulate and completely control her, coercing her into being his modern-day sex slave.

45. JARECKI started controlling more of Jane Doe 11's life, telling her that in order for him to keep her safe, she needed to move into his extra apartment right around the corner from his house at Gramercy Park.

46. JARECKI one day sent people to her place in Hell's Kitchen to move her stuff into JARECKI's apartment.

47.     Once JARECKI moved Jane Doe 11 into the apartment, located at 21 Gramercy Park South, Apartment 2C, his control over her was absolute. He told her that there was a landline that she always had to answer; otherwise, she would be punished by him.

48.     Jane Doe 11 felt and believes that she was under constant surveillance by JARECKI.

49.     JARECKI told Jane Doe 11 that he had access to the cameras at the front of the building so he would know when she came and went.

50.     Jane Doe 11 discovered that from JARECKI's bedroom in his house, he could see the apartment where Jane Doe 11 was living in the back of her building, causing her paranoia over the level of micromanaging control he was exercising over her.

51.     JARECKI told Jane Doe 11 that she had a strict bedtime of 10 P.M., and if he ever saw her light on at 10:15 P.M., JARECKI would call her the apartment landline and aggressively tell her to go to sleep.

52.     JARECKI then began using the apartment to force Jane Doe 11 to engage in sex with JARECKI, telling her how expensive the rent would be and that if she did not sexually please him when he wanted and in the manner he wanted, then he would have her thrown out on the streets.

53.     When Jane Doe 11 attempted to resist JARECKI's demands, he would call the landline and tell her that he was not pleased with her, and that she did not smile enough for his liking, which was unacceptable, considering that the rent she owed every month was $5,700 and that she was not required to pay because he was allowing her to pay in fulfillment of his sexual desires, whatever they might be – a deal Jane Doe 11 never agreed to and that was created unilaterally by JARECKI as a means of sex-trafficking her.

54. While JARECKI was elderly, his sexual desires were frequent and depraved.

55. JARECKI showed Jane Doe 11 pills that he said were testosterone pills that kept his sexual drive equal to that of a 25-year-old.

56. Any time Jane Doe 11 would appear depressed or put up any level of resistance, JARECKI would remind her of the high rent that he could be charging and aggressively threaten punishment if she did not follow his sexual commands.

57. As Jane Doe 11 began showing more signs of depression and stress, JARECKI increased the sexual torture and control of her.

58. JARECKI started inviting other guys over and forcing Jane Doe 11 to have sex with these other men in front of him, which he did on numerous occasions.

59. When Jane Doe 11 expressed how much she hated what JARECKI was making her do, JARECKI took her to his computer and asked her to help him choose the next guy he was going to make her have sex with in front of him. Jane Doe 11 was crying and repeating that she did not want to do this, but JARECKI seemed to get aroused by Jane Doe 11's emotional suffering.

60. While JARECKI ramped up his sexual domination over Jane Doe 11, and she in turn showed more signs of emotional deterioration, JARECKI would constantly remind her of her fragile immigration status and demonstrate even greater control over her life.

61. JARECKI started sending the staff from his house (a husband and wife from the Philippines) every day to clean Jane Doe 11's apartment, over her strong objection.

62. Jane Doe 11 reasonably felt as though she was under constant surveillance, and when Jane Doe 11 expressly told him that she wanted to clean her own space and not have his staff in there every day, JARECKI told her that he doesn't trust her mental state and wants to make sure there are no surprises over there – a clear indication that JARECKI was only doing this to exert a

level of control over Jane Doe 11 and instill in her that she had literally no privacy in her life anymore.

63. JARECKI, to make sure he did not leave Jane Doe 11 unwatched, would force her to go to public events with him. There, she was introduced to other wealthy individuals connected to JARECKI.

64. While Jane Doe 11 was living in JARECKI's apartment and being sexually abused by him near daily, she was working as a model and using the money she made to pay attorneys and other expenses related to her work Visa and immigration documentation. JARECKI knew and exploited that fact, as he demanded that Jane Doe 11 submit to his every sexual command or risk losing her status in this country, or be thrown out on the streets, or be sent back to Epstein, which JARECKI threatened on numerous occasions.

65. JARECKI would threaten and degrade Jane Doe 11 regularly, saying things like, "if you are difficult with me, and refuse to be with one ugly old man, I will ship you back to Epstein so he can send you to more ugly old men, and you won't be able to do anything about it with your immigration problems."

66. JARECKI then insisted that Jane Doe 11 begin turning down modeling jobs to service him more, even though she needed to work to remain on her work Visa and needed the money for immigration attorneys.

67. JARECKI would constantly tell Jane Doe 11 that she was stupid and demean her as having unreasonable dreams because she had no talent as a model or actress.

68. In addition to raping Jane Doe 11 by force on dozens of occasions in New York, JARECKI trafficked Jane Doe 11 from New York to his private island in the Caribbean where he sexually abused her there as well.

69. For years, Jane Doe 11 was subjected to mental and sexual abuse at the hands of JARECKI, and JARECKI was extremely forceful and violent in his many rapes of Jane Doe 11.

70. JARECKI eventually told Jane Doe 11 that she would need to start having threesomes with him and another young female. This was said in front of JARECKI's wife Gloria, who Jane Doe 11 feels sure knew about everything JARECKI was doing to her.

71. Eventually, Jane Doe 11 moved out of the apartment, as she could not handle the emotional distress she was suffering, even though JARECKI promised her that her life would collapse if she tried to have a life without being under his control.

72. JARECKI repeatedly raped Jane Doe 11 starting in 2011 and the last contact of any kind between JARECKI and Jane Doe 11 was December 2014.

73. Jane Doe 11 never consented to the sexual abuse perpetrated by JARECKI.

74. Jane Doe 11 never initiated, invited, or acquiesced to the sexual abuse perpetrated by JARECKI but only succumbed to it out of fear of JARECKI.

75. Jane Doe 11 repeatedly expressed that she did not consent to any sexual acts perpetrated by JARECKI and each was committed either through forcible compulsion or due to JARECKI's masterful use of fraud or acts of coercion.

## COUNT I
## SEXUAL BATTERY

76. The Plaintiff adopts and realleges paragraphs 1 through 75 above.

77. The intentional acts of HENRY JARECKI against Plaintiff constitute a sexual battery as defined in New York Penal Law § 130, including but not limited to the following:

   a. Sexual misconduct as defined in §130.20 inasmuch as JARECKI engaged in sexual intercourse with Plaintiff without Plaintiff's consent;

   b. Rape in the third degree as defined in §130.25 inasmuch as JARECKI engaged in sexual intercourse with Plaintiff without her consent;

c. Forcible touching as defined in §130.52 inasmuch as JARECKI, intentionally and for no legitimate purpose, engaged in the forcible touching of Plaintiff's sexual parts for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire;

d. Criminal sexual act in the third degree as defined in § 130.40 inasmuch as JARECKI engaged in oral sexual conduct and anal sexual conduct with Plaintiff without her consent; and

e. Sexual abuse in the third degree as defined in § 130.55 inasmuch as JARECKI subjected Plaintiff to sexual contact without her consent.

78. As such, JARECKI subjected Plaintiff to bodily harm when he physically sexually battered her without her consent.

79. As a direct and proximate result of HENRY JARECKI's violations of New York Penal Law § 130, Plaintiff has in the past suffered, and in the future will continue to suffer, physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy, and a loss of her capacity to enjoy life, as well as other damages. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

80. This cause of action is timely under the Adult Survivors Act N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff who was eighteen or older at the time of the conduct, that constitutes a sexual offense as defined in Article One Hundred Thirty of the New York Penal Law ("Article 130").

WHEREFORE, Plaintiff demands judgment against HENRY JARECKI for compensatory and general damages, attorney's fees, punitive damages, and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT II

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

81. The Plaintiff adopts and realleges paragraphs 1 through 75 above.

82. HENRY JARECKI sexually abused Plaintiff on numerous occasions over the course of several months.

83. JARECKI's intentional conduct was extreme and outrageous, endangered Plaintiff's physical safety, and caused severe and lasting emotional distress and serious injuries to Plaintiff's mental health.

84. JARECKI's conduct of forcibly and violently sexually assaulting Plaintiff, particularly given his status as a medical professional whom Plaintiff was introduced to under the guise of obtaining medical treatment, is conduct that shocks the conscience.

85. JARECKI's actions were taken with intent to cause severe emotional distress.

86. As a direct and proximate result of JARECKI's violations of New York Penal Law § 130, Plaintiff has in the past suffered, and in the future will continue to suffer, physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy, and a loss of her capacity to enjoy life, as well as other damages. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

87. This cause of action is timely under the Adult Survivors Act N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff who was eighteen or older at the time of the conduct, that constitutes a sexual offense, as defined in Article One Hundred Thirty of the New York Penal Law ("Article 130").

WHEREFORE, Plaintiff demands judgment against HENRY JARECKI for compensatory and general damages, attorney's fees, punitive damages, and such other and further relief as this

Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT III
## PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT 18 U.S.C. §§ 1591(a)(1), 1595

88. The Plaintiff adopts and realleges paragraphs 1 through 75 above.

89. JARECKI knowingly and intentionally, through various means, participated in, perpetrated, assisted, supported, and facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, in violation of 18 U.S.C. § 1591(a)(1).

90. At all times material hereto, JARECKI, through means of force, threats of force, fraud, and/or coercion, caused Jane Doe 11 to engage in commercial sex acts.

91. Specifically, Jane Doe 11 was forced to engage in commercial sex acts with JARECKI in New York City and his private island in the Caribbean.

92. JARECKI, at all times material hereto, was sexually abusing Jane Doe 11 through means of force, fraud, and/or coercion including but not limiting to:

    a. Threatening to revoke her VISA if she failed to comply with his demands;

    b. Threatening to send her back to Epstein if she failed to sexually please him the way he wanted to be pleased and as often as he demanded it.

    c. Promising to pay her rent so long as she complied with his every demand for the duration of JARECKI's trafficking;

    d. Falsely promising to buy her an apartment if she "was good" for the duration of JARECKI's trafficking and did what he told her to do;

    e. Providing her with medication to help treat her depression, so long as she remained compliant with his sexual demands;

    f. Threatening her career if she refused to engage in commercial sex acts with him; and

g. Providing her items of value such and demonstrating to further coerce her into engaging in commercial sex acts.

93. As a direct and proximate result of JARECKI's violations 18 U.S.C. § 1591, Plaintiff has in the past suffered, and in the future will continue to suffer, physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy, and a loss of her capacity to enjoy life, as well as other damages. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against HENRY JARECKI for compensatory and general damages, attorney's fees, punitive damages, and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated: June 3, 2024.

Respectfully Submitted,

| EDWARDS HENDERSON | BOIES SCHILLER FLEXNER |
|---|---|
| By: /s/ Bradley Edwards | |
| Bradley J. Edwards | David Boies |
| Brittany N. Henderson | Andrew Villacastin |
| 425 N. Andrews Avenue | 55 Hudson Yards |
| Suite 2 | 20th Floor |
| Fort Lauderdale, FL 33301 | New York, NY 10001 |
| (954)-524-2820 | (212) 446-300 |
| Fax : (954)-524-2822 | Fax : (212) 446-2350 |
| brad@cvlf.com | dboies@bsfllp.com |
| brittany@cvlf.com | avillacastin@bsfllp.com |
| ecf@cvlf.com | |
| | Sigrid McCawley |
| | 401 E. Las Olas Blvd. |
| | Suite 1200 |
| | Fort Lauderdale, FL 33316 |
| | (954)356-0011 |
| *Attorneys for Plaintiff* | smccawley@bsfllp.com |